Good morning, Your Honors. My name is Carloba Adams-Powell, and I represent the appellants in this matter, Michelle MacDonald Shimota and Thomas Shimota. The District Court erred when it dismissed the majority of appellants' complaint for failure to state a claim and the remainder of the case on summary judgment. Since this Court's review of the case is de novo, appellants respectfully request that the Court reverse the decision of the District Court and remand this case for further proceedings and trial. On September 11, 2013, Michelle MacDonald Shimota filed a federal class action suit on behalf of her client, at that time appeared before Judge Knutson for a trial in a family law case. In light of this filing, appellant Michelle MacDonald Shimota asked Judge Knutson to recuse himself. Judge Knutson denied that motion, and the case proceeded to trial. So the next day, September 12, 2013, Michelle MacDonald Shimota appeared for trial. Once inside the courtroom, but before any trial, she took a photograph of Deputy Gonder, one of the county defendants in this matter. During a break, the county defendants approached Ms. MacDonald while she was peaceably working at counsel table. County defendants then illegally seized and detained Ms. MacDonald, handcuffed her and placed her in a holding area without warning or cause. Why illegally? The basis, the county defendants make the claim, Your Honor, that the basis for the arrest was the alleged commission of a misdemeanor crime. Was that based on taking the photograph? That was based on taking the photograph, Your Honor. Which was contrary to the rules, is that correct? Court rules? Well, that's a question of fact, Your Honor. That's one of the issues that we believe should have been put before the jury to make a determination as to whether or not the photo was taken actually during the proceeding. Only if it's the prohibition is only for taking photos during a proceeding. So the officers who made the choice to arrest arguably could have been wrong. But even if they're wrong, that would still have been a legal basis for making an arrest. Sometimes officers make mistakes in choosing to arrest someone and a mistaken arrest is not necessarily any legal arrest. Well, there's a longstanding rule in Minnesota, and I'm sure you all are aware of this, that when in a misdemeanor case, there should just be a citation issued. An arrest is only necessary if it's to protect the person from, to protect from injury or further commission of a crime. I could be wrong, but I thought if the misdemeanor was committed in the presence of the officer that they can do an arrest. Am I wrong about that? Well, I didn't see that distinction, Your Honor. It's my understanding that the rule is if there's a misdemeanor committed, that a citation should be issued. And in this case, Ms. McDonald was not provided a citation at all. It wasn't until she was released on September 13th that mysteriously a citation appeared in her property. What about Minnesota Statute 629.34 parens 1? I thought it suggested that a person can be arrested for the misdemeanor if the offense behavior occurred in the presence of the arresting officer. Well, if that's true, Your Honor, then, I mean, I can't dispute that, but our position Then would you agree that there was arguable probable cause for this officer to make the arrest based on the photo? Based on that statute that the court just provided? If I'm right about that. If you're right, yes. So after that, Ms. McDonald was arrested and kept in handcuffs and placed in solitary confinement in jail. Was there ever, is there anything in the record to indicate the reason for the transfer to the male facility versus the female facility? Is there anything in the record to indicate if there was overcrowding at one, if there was any reason for that? That's what's most telling, Your Honor. There was absolutely no reason given as to why Ms. McDonald was detained for two days in an all-male facility. After Ms. McDonald was taken to the holding area, arrested, her property taken, and she was handcuffed to a belt that was placed around her waist, she was asked some questions and she did not respond. The county defendants claim that this is why they placed her in a wheelchair and, again, she was still handcuffed to this belt. And then they wheeled her back in the courtroom and she was forced to complete her trial while to adequately move forward with this trial, although she was forced to complete the trial in handcuffs. After she completed the trial, she was then, while still being in the wheelchair and handcuffed, wheeled over to the adjacent male facility where she remained for two days. I asked— Two full days? I thought that, something tells me I read that it was like 23 hours, but you're saying it was 48 hours? Well, our brief says two days. The county defendant's brief says 26 hours, Your Honor. It is our position that it was two days. It was September 11th, Your Honor, until September 13th. But she was released the same day as the court ordered to release her, right? Which was September 13th. Same, and she was released that day? Yes, but she was not released immediately upon issuance of the order. She was released later. Okay, so is that period of time—Number one, do you know what that period of time was from the court order to the release? And number two, is that period of time sufficient to shock the conscience? Well, that's a question for the jury, Your Honor, in our position as to whether or not that period of time shocks the conscience. But the jury— We've done that initially as well. Okay, okay. For qualified immunity purposes, it's a question of law. And so your question, again, your answer was, Your Honor, was— Number one, how long was the period of time from the court order until she was released? And then number two, why is that sufficient? I assume you're going to argue it's sufficient to shock the conscience. Yes. It was an unspecified amount of time in our position, Your Honor, and I believe this whole ordeal shocks the conscience. It's our position that the judge ordered Ms. McDonald to be immediately released, so any amount of time detaining her against the order of a judge shocks the conscience. Do you have any case law that says that? Any amount of time? Well, it doesn't necessarily say any amount of time, Your Honor, but there is case law to support that position. There is also case law that was provided by the county defendants that says that 12 hours, I believe, Your Honor, did not shock the conscience. While Ms. McDonald— First of all, I'd just like to say that Ms. McDonald had never been incarcerated prior to this incident. Therefore, this experience was absolute torture. It was traumatic. It was terrifying and permanently life altering. Since this incident, Ms. McDonald has struggled with post-traumatic stress, weight loss, anxiety, depression, and insomnia as a direct result of her arrest, confinement, and torment due to this baseless criminal contempt charge. Her husband has also suffered loss of consortium as a result of the above-mentioned matters. Was that question appealed? I didn't see any reference to the loss of consortium claim in the briefs. In the brief, Your Honor, I believe it just generally states all claims in the complaint. I don't think it was specifically delineated. Is that sufficient to preserve it for appeal? We believe so, Your Honor. The county defendants utilized seven out of 11 internationally recognized forms of detention during Ms. McDonald's detention, which included sexual humiliation, sleep deprivation, sensory deprivation, solitary confinement and isolation, temperature extremes, sensory bombardment due to noise, and psychological techniques. Counselor, you're restating allegations from your complaint. Cite to us law and facts that actually occurred in this case that would indicate that dismissal was improper. Okay, Your Honor. Respectfully, that's what my intention was, to lay out the facts so then I can tie them to the law, but I will get- Your time is going to slip by. I will get to that. If you continue the technique you're using, you won't have enough time to do that. Okay. So, Your Honor, Ms. McDonald was not allowed a phone call to an attorney or to her family at any time during the two days she was detained. And we are all well aware that you are allowed a call when you have been arrested. The county defendants told her she'd not be allowed to make a call until she was booked. The county defendants provided information that she was not booked, but a simple research showed that she was booked and issued a booking ID number. So she should have absolutely, by her constitutional right, been provided a telephone call. She was- But she refused to provide any pedigree information that normally is part of the booking process, right? Well, respectfully, that's not correct, Your Honor. The county defendants in their brief and their own admission say that county defendants were aware of who Ms. McDonald was, they knew her name and her date of birth, and that would have been sufficient in order to book her. But she refused to provide any information. Correct. Which she has a Fourth Amendment right not to answer questions when under the- Fifth Amendment right, you mean? Fifth Amendment, yes, Your Honor. That's only if it's going to incriminate you, right? Well, no, not the Fifth Amendment, Your Honor. Under the U.S. Supreme Court- You have a Fourth Amendment right not to provide pedigree information? The U.S. Supreme Court says that you're not obligated to answer or your answers cannot be compelled, and your refusal to answer is not a basis for arrest. In Dunaway v. New York, Your Honor, I'm quoting Terry v. Ohio. She was already under arrest, though. But her refusal to answer is not a basis for arrest. I won't argue with that. The basis for the arrest was the taking of the photo. Correct. But with them already knowing the information, they had sufficient information to move forward, Your Honor, is our position. While Ms. McDonald was confined, she- Counsel, you're in your rebuttal time. You can continue if you'd like, or you can reserve. I'd like to reserve the remaining time for rebuttal. Thank you, Counsel. Mr. Gregory? Good morning, Your Honors. May it please the Court. Pete Gregory from Bassford-Renley on behalf of Appellee's Dan Flegel and his law firm, Flegel Law Firm. I'm going to- Mr. Flegel was the prosecutor, part-time prosecutor, I think was the- That is correct, Your Honor. He was a city prosecutor for the City of Hastings on a contract basis. I'm going to confine my comments to no more than five minutes so that co-appellees have adequate time to address the issues on appeal. There hasn't been any argument in front of the Court with respect to the Court's dismissal of the claims against my clients based on prosecutorial immunity, but I'm going to just focus my comments on a few key issues. The prosecutorial immunity analysis is pretty straightforward, but essentially, appellants have made two arguments against application of that doctrine to my clients. Number one, appellants argue that for purposes of prosecutorial immunity, my client's not a state actor, and number two, appellants argue that my clients are not entitled to that protection by virtue of the fact, or according to the appellants, that my client's in non-prosecutorial or administrative activities. So let me address those two. With respect to the first argument, the glaring inconsistency, of course, is that if my clients are not state actors, then they're not subject to liability under Section 1983 or any of the other sources of causes of action asserted against them. You can't state that categorically. That is the beginning of the analysis, Your Honor. I concede that at the margin- Private actors who participate in constitutional violations by public officers can be liable. And I would concede that, Your Honor. I will. But the- I said the opposite. Okay. Well, the primary analysis here is that this Court has consistently applied federal U.S.  and not the employment status in order to determine whether and when actors are entitled to prosecutorial immunity. And under that standard, there's no doubt that my clients were indeed performing a governmental function in carrying out their prosecutorial responsibilities. With respect to the second argument, that is whether or not my clients were engaged in merely administrative activity, I would note that the complaint is not specific about exactly what that activity was. Well, let me suggest maybe that it is that your client contributed to her delayed release, which would be more of an administrative function, by ignoring a court order for her immediate release. And, Your Honor, that is in fact how the District Court construed the appellant's allegations. I would invite the Court to examine the allegations at Appendix 30 through 36. I don't necessarily agree with that characterization, but I'm prepared to address that characterization. As the Court noted earlier this morning, the decisions of this Court have held that a delayed release of up to 12 hours does not violate a clearly noted- Does the record tell us the time frame here? So in the complaint, it does not. And that's why my client is at a disadvantage, because it's the appellant's burden to plead sufficient facts in order to make out a case that there has been a violation, a clear violation of a known constitutional right. And because we don't have those facts, or my client doesn't have those facts on a Rule 12 basis, my client's not able to respond effectively to that allegation. The other allegation that's made on this- Usually why you don't get qualified immunity in a 12b6 motion. Well, the other- I don't necessarily agree with that, Your Honor, because this Court has at least on two occasions in the Cole and the Anderson decisions- You said usually. Right. So this case would, I would argue, and urge the Court, falls within the ambit of the Cole and Anderson cases in which this Court has applied qualified immunity under analogous circumstances. In those two cases, city attorneys were providing services that were supplementary to their prosecutorial functions, and in both cases, this Court affirmed that they were entitled at least to qualified immunity, if not absolute prosecutorial immunity. I've got just a few seconds left, then I'd like to reserve the rest of that time for Co-Op Police. Thank you. Thank you, Mr. Greger. Mr. Timmerman? Good morning, Your Honors. May it please the Court, it's a privilege to appear before you today. I'm Jeff Timmerman, and I represent Appellees Bob Wagner, Chris Melton, Tim Gonder, John Knapper in Dakota County. I'm going to refer to them at times as just simply the County Defendants. I'm going to refer to the appellant as Ms. McDonald. I know that's different than what the case caption says. That's the name she uses professionally. It's also the name she's used in her past in current Supreme Court, Minnesota Supreme Court candidacies. Your Honors, ultimately, this case boils down to, we've got this parade of horribles that's alleged in this 66-page amendment complaint. The first question that the District Court passed on was, is this enough to actually state a claim? And for most of those allegations, the District Court determined that, no, it was not. And then, with respect to the few claims that did pass that hurdle, the District Court was tasked with answering the question, why did these things occur? And that's really where the critical answers come in. When we're talking about why Ms. McDonald was arrested, Judge Grundy, you referenced Minnesota Statute 629.34, Subdivision 1. There also, at the time, was a standing order issued by Chief Judge William Macklin of the Dakota County District Court, which dictated that no photography was allowed anywhere in the courtroom or courtroom areas of the Dakota County Judicial Center. That's at Appellant's Appendix, page 80. Let me ask you, did that order limit it to a proceeding or just in the courtroom in general? In the courtroom or courtroom areas in general, Your Honor. In fact, the Minnesota Supreme Court, in Ms. McDonald's professional discipline case, compared the Rule 4.01 general rule of practice, which has the limiting language, with the Macklin order that Chief Judge Macklin had entered, and concluded that the Macklin order took a rule of situational applicability and made it across the board. So in September of 2013, per the Macklin order, no photography was allowed in any courtroom or any courtroom area of the Dakota County Judicial Center. And that plays in, of course, to arguable probable cause. On that front, I think, Your Honors, that the Ulrich v. Pulp County case is most analogous from 2015 in this court. Of course, factually wise, Mr. Ulrich was arrested for violating a harassment restraining order. One of the officers who participated in the arrest indicated verbally that the plaintiff's, Mr. Ulrich's, interpretation of the HRO may have been technically correct. It prohibited indirect contact with his ex-spouse. And despite that, this court didn't hesitate to find that there was at least arguable probable cause for arresting him for violating the harassment restraining order, because arguable probable cause isn't based on the subjective knowledge and intent of the arresting officer, it's based on an objective reasonable person standard. Ms. McDonald below challenged the efficacy of the Macklin order. I'm not aware of any case law that has denied qualified immunity based on arguable probable cause to an officer who enforces a law that's later determined to be, for whatever reason, improper. So that's why Ms. McDonald was arrested in the first place. Let's talk next, if we could, about the Lozman case. And I wanted to briefly bring this up today because after briefing in this case was complete, the US Supreme Court decided the Lozman versus City of Riviera Beach, Florida case, which dealt with whether probable cause is a bar to a First Amendment retaliation action. This obviously is not referenced in our briefing because this case came down after briefing was complete. That was the question presented in Lozman, but it's not the question that the court chose to answer in Lozman. Have you submitted it in a 28-J? I have not, your honor, the Lozman decision. I just briefly wanted to discuss its applicability in case your honors were concerned at all. I can give you a cite. I can give you a cite for the Lozman case, most certainly. Well, we do need a 28-J letter. Okay. It's 138, Supreme Court, 1945, and I won't belabor the point. I just wanted to, in case the court had questions about the Lozman decision, the question presented was whether or not probable cause is a bar to a First Amendment retaliation claim. The court didn't answer that question. No, this case, it really isn't much help. It's not much help. The rule here still, of course, is that probable cause is a complete bar. The Supreme Court has accepted cert on a case that's going to be argued November 26th. So what was the necessity of having her come back and try the case in handcuffs without her glasses? What was the necessity of that? Well, your honor, the handcuffs piece in the record bears this out. It's standard protocol for persons under arrest in the Dakota County Courthouse to be in handcuffs and to be accompanied by a deputy at all times. With respect to the glasses- It never happened to a lawyer in that county. Not that any of my officers are aware of, your honor. It's hard to imagine a lawyer in a courtroom, handcuffed, trying a case. It just boggles the mind. It is. I agree. I can tell you that none of my clients wanted this to happen the way that it did that day, but they simply did their job when faced with the circumstances that they were faced with. Whose decision was it? To handcuff her? Yes. That would be- While the trial, while she's trying a case. Sergeant Chris Melton enforced the policy of the Dakota County Sheriff's Office, which is if someone is in custody and in court, they're in handcuffs. And that's exactly what happened here. With respect to the glasses and shoes, your honors, the record bears out that those were removed in this bailiff station holding area. After Ms. McDonald was originally detained, she refused to put her shoes on and she refused to put her glasses on. In fact, my clients testified that the glasses accompanied her to counsel's table and one of my clients asked her specifically if she wanted help putting her glasses on and she didn't respond to him. Which was a recurring theme of this day. She just simply didn't respond to questions. And that also occurred during the actual trial that she was managing that day or that she was litigating that day when the judge asked questions of her, she just sat silently. I wanted to talk next a little bit, your honors, about this issue of citing versus arresting. Obviously, the rule is that the Fourth Amendment doesn't bar arrest and pretrial detention for even minor criminal defenses. Or put differently, Ms. McDonald had no constitutional right to be cited and released. And technically, she could have been detained until a timely judicial determination of probable cause was made. Below and again in her appellate briefing here, your honors, Ms. McDonald continues to attempt to shoehorn in a rule of Minnesota criminal procedure, rule 6.01, and morph that into a standalone actionable section 1983 basis. But your honors, the case law in this court is clear and as Judge Thunheim appropriately interpreted that case law, you can't take a state rule or a law in that manner and turn it into a basis for a section 1983 claim. I see my time is running short. I wanted to address- I want to address the confinement conditions claims and the appropriateness of summary judgment on those claims. I will, your honor. Thank you. I wanted to make clear at the beginning that we analyzed her confinement conditions claim strictly under the Bell v. Ingram v. Cole County case as to whether deliberate indifference applied outside of the provision of medical care context under the 14th amendment for pretrial detainees. We just went with the Bell v. Wolfish standard. Everything that happened to Ms. McDonald was in keeping with penological interests, as the district court found. If you refuse to answer medical questions, we can't rule out the fact that you might have a contagious disease, so you're placed in a negative pressure room until your general health is cleared. Is there anything in the record? Why was she taken to the male facility versus the female facility? There is something in the record, actually, your honor, and this also goes to the length of her confinement and the length of the delay in release. It's at Appellee's Appendix, pages 12 and 13, normally what happens is female inmates come in and they're booked. And then within a couple of days, they are moved to the Ramsey County Workhouse, where female inmates are housed on a longer term basis. It does take a couple of days sometimes, due to transport issues and booking issues and how busy the jail is. But it's usually within a couple days that females are boarded out. Also, she was confined for a total of 26 hours, and there was a one hour and five minute gap between when she originally went to court on September 13th and when she was ultimately released. That's all in Appellee's pages 12 and 13. The other things that happened to Ms. McDonald, your honors, I will mention that with the Smith and Williams cases, we're talking about four days with things like no water, raw sewage, no clothing. Those are not actionable. Here, what happened to her happened for reasons, and we've articulated those reasons. I see my time is up, thank you. Thank you, Mr. Timmerman. Ms. Powell, you have just under three minutes for rebuttal. Just briefly, your honor, in the interest of time, all of our arguments are articulated in our brief. But I would like to point out that this case is riddled with fact issues that should have been submitted to the jury. And that's why we feel that the district court erred in granting Rule 12B6 relief, as well as some re-judgment. The court asked an interesting question as to what was the necessity of having her try the case in the handcuffs. This goes to, as we stated in our brief, the fact that the defendants wanted to further the public humiliation of Ms. McDonald from being arrested in front of her client in an open courtroom, being handcuffed. The necessity was to further the conspiracy that they had all engaged in, to publicly humiliate her and to retaliate against her for her exercise of her First Amendment right in criticizing Judge Knutson. And that is why all these things that are mind-boggling to you, your honor, and things that we believe shock the conscience, your honor, occurred in this case. And for all the other reasons- Is there a possibility of jury trial? I believe so, but I'm not sure. Be unusual. What do you think? Yeah, I don't- Most jurisdictions, those are handled by the judges. So, for all of these reasons, we would ask that this case be reversed and remanded for further proceedings. Thank you. Thank you, Ms. Powell. Court thanks both counsel for the arguments you provided to the court, the briefing which you've submitted. We'll take the case under advisement. May be excused. Madam Clerk, I believe that concludes our argued calendar for this day. That being the case, court will be in recess until tomorrow morning at 9 AM.